Bobby WILLIAMS, Plaintiff,

v.

Robert B. GREIFINGER, Deputy Commissioner and Chief Medical Officer of the New York State Department of Correctional Services, Defendant.

No. 95 Civ. 0385 (JSM).

United States District Court,
S.D. New York.

Jan. 30, 1996.

Bobby Williams, Ossining, NY, pro se.

Barbara K. Hathaway, State of New York Office of the Attorney General, New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

Plaintiff, who is proceeding *pro se,* is an inmate at Ossining Correctional Facility. He challenges the constitutionality of certain components of a Department of Correctional Services ("DOCS") policy governing tuberculosis (TB) testing of inmates as violative of the Eighth Amendment's prohibition against cruel and unusual punishment. More specifically, plaintiff challenges that portion of the policy under which inmates who refuse to submit to certain TB tests are confined to their cells at all times except for one shower per week and legal visits, until such time as they agree to be tested.

Defendant was the Deputy Commissioner and Chief Medical Officer of DOCS for the relevant period of time. He helped formulate and then approved the challenged policy. The defendant argues that the challenged policy does not violate the Eighth Amendment. Alternatively, defendant argues that, even if the policy violates the Eighth Amendment, he reasonably believed that it was constitutional and is therefore entitled to qualified immunity from personal liability. This case is now before the Court on the parties' cross-motions for summary judgment.

### I. *Background*

As part of its response to the growing public health crisis involving the spread of tuberculosis among prison inmates, DOCS instituted a TB Control Program in 1991. DOCS Health Service Policy, Item #1.18 (the "policy") is part of that program. Under the policy, inmates are required to undergo a Purified Protein Derivative (PPD) test upon entry into DOCS custody in order to screen for the presence of TB infection. The PPD test consists of a protein injection into the skin. Previous exposure to TB causes a thickening of the skin in the area of the injection, and indicates that the inmate has at least latent TB, which is not contagious under normal circumstances.

The policy mandates a follow-up chest x-ray to a positive PPD test to determine if the inmate actually has active TB, and offers PPD-positive inmates the opportunity to receive six months of preventive therapy. Inmates with indications of active TB are placed in respiratory isolation. PPD-positive inmates without such indications may return to the general population whether or not they undergo preventive therapy. If the PPD test is negative, the policy states that the inmate is to be re-tested at least annually to determine if he has become infected since the previous test.

There is a slight risk of excessive local reaction to the PPD test, which usually can

be treated promptly with medication. Under the policy, inmates with a physician's written documentation of prior skin reactivity will be excused from testing, but other inmates who refuse to submit to the PPD test are to be confined under "medical keeplock" status. This status results in the inmates' confinement to their cells at all times except for one shower per week and legal visits. Inmates under medical keeplock are frequently counseled about the importance of the PPD test, and are asked to reconsider their refusal to take the test. These inmates are not kept in respiratory isolation from the general population.

Plaintiff first took a PPD test on December 19, 1991, after which he alleges to have complained to the nurse of redness on his arm and shortness of breath. The test was negative, and the medical records do not indicate plaintiff's complaints of an adverse reaction. On March 2, 1993, plaintiff refused to submit to a PPD re-test, and was placed in medical keeplock until October 12, 1994, at which time he agreed to undergo the second PPD test. The result of this test was also negative. Plaintiff filed this suit in January 1995, seeking declaratory relief and compensatory and punitive damages.[1]

## II. Discussion

### A. Summary Judgment Standard

■ Summary judgment is proper when there is no genuine issue of material fact and, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In order to defeat a motion for summary judgment, the factual dispute must be both material and genuine. In determining genuine facts, the shadow of a doubt is insufficient; the Court must be satisfied that evidence exists upon which the finder of fact could reasonably find for the party opposing the motion.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986).

In this case, the defendant admits that plaintiff was confined without any opportunity for out-of-cell exercise pursuant to the challenged medical keeplock policy. The only issues for resolution, therefore, are whether plaintiff's confinement constituted an Eighth Amendment violation and, if so, whether defendant is entitled to qualified immunity.

### B. Plaintiff's Eighth Amendment Claim

■ As the Supreme Court stated in *Rhodes v. Chapman*, "[i]t is unquestioned that '[c]onfinement in a prison ... is a form of punishment subject to scrutiny under the Eighth Amendment standard.'" 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981) (quoting *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570–71, 57 L.Ed.2d 522 (1978)). Conditions of confinement that result in the deprivation of basic human needs, as judged by contemporary standards of decency, are unconstitutional. *Rhodes* at 347, 101 S.Ct. at 2399–400.

■ In order to show that a prison official has violated the Eighth Amendment, a plaintiff must meet two requirements. First, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer v. Brennan*, — U.S. —, —, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)). The second requirement is subjective, and requires a showing that the defendant was "deliberately indifferent" to plaintiff's health or safety. *Farmer* at —, 114 S.Ct. at 1977. The proper test for "deliberate indifference" is that the prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at —, 114 S.Ct. at 1979.

■ The defendant argues that the plaintiff cannot fulfill the "deliberate indifference"

1. In February 1995, DOCS amended its medical keeplock policy to include one hour of exercise each day and three showers each week. This amendment, and the fact that plaintiff is no longer confined under keeplock status, renders plaintiff's request for relief from the policy moot. In any case, plaintiff states that he seeks declaratory relief "for the expressed purpose of obtaining Compensatory and Punitive damages." Memo. of Law in Supp. of Compl. at 13. Since plaintiff was confined pursuant to the old, unamended policy, the Court will examine the constitutionality of that policy so as to determine whether plaintiff is entitled to such damages.

requirement for Eighth Amendment violations because the TB program was instituted in order to protect, and not harm, the plaintiff and other inmates. This argument must fail. The Eighth Amendment establishes a floor on conditions of confinement beneath which prison officials cannot venture. This is true even if the ultimate aim of the officials is benign. The officials cannot use methods that show deliberate indifference to inmates' health and safety so as to attain their goals. *See Sostre v. McGinnis,* 442 F.2d 178, 208 (2d Cir.1971) (Feinberg, J., dissenting in part and concurring in part) ("the means used to exact submission must be constitutionally acceptable, and the threat of virtually endless isolation that endangers sanity is not"), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, *cert. denied,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).

■ For this same reason, defendant's argument that there is no Eighth Amendment violation because plaintiff effectively held the keys to his cell in that he could, and ultimately did, end his confinement by submitting to the requisite test, also fails.[2] While the institution of a TB Control Program was a positive, and no doubt necessary, response to the growing problems caused by TB in the prison system, prison officials must accomplish the goals of the program in a manner consistent with constitutional principles.

■ In this case, the plaintiff does not challenge the constitutionality of mandatory TB testing; he only protests against the method that DOCS has chosen to enforce that policy. Specifically, the plaintiff challenges the denial of all exercise as a response to his refusal to submit to the PPD test.[3] It is thus the cases examining this denial, and not the cases acknowledging the importance of TB testing, which are relevant to this Eighth Amendment inquiry. *See Jolly v. Coughlin,* 894 F.Supp. 734, 746 (S.D.N.Y.

1995) (examining whether DOCS' medical keeplock policy is cruel and unusual under the circumstances of the case and stating that "[t]he appropriate inquiry ... is not, as the defendants argue, whether the TB Control Program, with its mandatory screening, violates the Eighth Amendment").

In *Anderson v. Coughlin,* the court stated that courts, including those in the Second Circuit, "have recognized that some opportunity for exercise must be afforded to prisoners." 757 F.2d 33, 35 (2d Cir.1985) (citations omitted). *See also Alston v. Coughlin,* 668 F.Supp. 822, 837 (S.D.N.Y.1987) ("Opportunities for exercise must be afforded to prisoners"); *Rhem v. Malcolm,* 371 F.Supp. 594, 627 (S.D.N.Y.1974) ("The right of a prisoner to reasonable physical exercise is fundamental" so that the "50 minute per week opportunity for exercise at MHD (even supplemented by other recreation programs) does not meet constitutional standards" for pretrial detainees), *aff'd,* 507 F.2d 333 (2d Cir.1974); *Albro v. Onondaga,* 681 F.Supp. 991, 995 (N.D.N.Y.1988) ("Detainees, even those [held] for only a short time, ought to be afforded at least 1 hour of exercise per day").

Other circuits have also noted that "[t]here is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979); *see also Mitchell v. Rice,* 954 F.2d 187, 191 (4th Cir.1992) (general rule is that "complete deprivation of exercise for an extended period of time violate[s] Eighth Amendment prohibitions"); *Davenport v. DeRobertis,* 844 F.2d 1310, 1315 (7th Cir. 1988) (affirming district judge's order that prison officials allow at least five hours of out-of-cell exercise per week and stating that "we are impressed by the number of decisions that hold or suggest that a failure to

2. This is not to say that defendant's belief that this circumstance rendered the policy constitutional was unreasonable. That is a separate issue which goes to qualified immunity, and it is examined below. *See Davis v. Scherer,* 468 U.S. 183, 190–91, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) ("Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it

is further demonstrated that their conduct was unreasonable under the applicable standard").

3. Although plaintiff also complains of the restrictions on his shower and visitation privileges, he concedes that the caselaw supports only his argument that the deprivation of exercise violates the Eighth Amendment.

provide inmates ... with the opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions"), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Patterson v. Mintzes,* 717 F.2d 284, 289 (6th Cir.1983) ("It is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees. Inmates require regular exercise to maintain reasonable good physical and psychological health"); *Ruiz v. Estelle,* 679 F.2d 1115, 1151 (5th Cir.1982) ("Courts have frequently stated that confinement of inmates for long periods of time without opportunity for regular physical exercise constitutes cruel and unusual punishment"), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

The cases thus show that the total denial of exercise is a serious deprivation of basic human needs, and that defendant, by helping to formulate and then approving the challenged policy, was deliberately indifferent to the excessive risk that this deprivation posed to the plaintiff's health.[4]

The defendant points out that courts outside of this Circuit have indicated that exceptional circumstances, such as security needs, might justify restrictions on out-of-cell exercise. For example, in *Mitchell v. Rice,* the Fourth Circuit noted that "there can be exceptional circumstances where the general rule [that complete deprivation of exercise violates the Eighth Amendment] does not apply." 954 F.2d at 191. However, the *Mitchell* court recognized that the Ninth Circuit, the "one court to specifically address justifications for exercise restrictions," limited such justifications to "circumstances where 'disciplinary needs made [outdoor exercise] impossible.'" *Id.* at 192 (quoting *Spain,* 600 F.2d at 199).

Even if the Second Circuit recognized a security risk justification for the denial of out-of-cell exercise, this case does not involve such exceptional circumstances. The defendant argues that allowing inmates who refuse to be tested to remain in the general population could cause undue fear among other inmates and prison guards, and that such fear is not conducive to order in the prison facility. However, as the Ninth Circuit stated in rejecting the state's proffered justification of withholding outdoor exercise to protect against violent attacks by the plaintiffs, although "[t]hese concerns justify not permitting plaintiffs to mingle with the general prison population [they] do not explain why other exercise arrangements were not made." *Spain,* 600 F.2d at 200. In addition, "[t]he cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment." *Id.*

The TB Control Program obviously serves an important public health purpose. Prison officials may be justified in taking certain steps to maximize compliance with mandatory PPD testing, and in doing so may treat inmates who refuse to comply differently than inmates who participate in the program. However, this differential treatment, whether it constitutes punishment for refusing to comply or steps necessary to protect non-compliant inmates and others, may not include methods which violate the Eighth Amendment's protection against cruel and unusual punishment.

### B. *Qualified Immunity*

The plaintiff seeks damages against the defendant personally as permitted by *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). However, defendant pleaded qualified immunity in his Answer and now moves for summary judgment on the ground that he is entitled to such immunity as a matter of law.

---

4. The defendant suggests that the Second Circuit has not expressly ruled that an opportunity for in-cell exercise only would violate Eighth Amendment standards. While that argument is weak given the caselaw, it is also irrelevant in this case because the challenged policy offered no such opportunity for in-cell exercise. Nor does the defendant offer any evidence that the

plaintiff was given such opportunities. *See, e.g., Mitchell v. Rose,* 954 F.2d 187, 189 (4th Cir. 1992) ("In accordance with regulations, prison officials provided Mitchell with an exercise manual demonstrating in-cell exercises"), *cert. denied,* 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222.

Under the principles set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Therefore,

> [s]ummary judgment in favor of public officials may be appropriate when a qualified immunity defense is based upon a showing that it was not clear at the time of the officials' acts that the interest asserted by the plaintiff was protected by federal law. A Court may also grant summary judgment even if the contours of the plaintiff's federal rights and the public officials' permissible actions were clearly delineated at the time of the actions complained of, if it was objectively reasonable for the officials to believe that their actions did not violate those rights.

*Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993) (internal citation omitted). In making such a determination into the state of the law, the court must inquire whether

> the contours of the right [are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Having determined that the total denial of exercise violated the Eighth Amendment, the Court must now decide 1) if it was clearly established under federal law as it stood during plaintiff's confinement that the total denial of exercise under the circumstances of the medical keeplock policy was unconstitutional; and 2) if so, whether it was objectively reasonable for defendant to have believed that the policy did not violate those clearly established rights.

While this Court has concluded that denying plaintiff exercise did constitute a violation of his Eighth Amendment rights, none of the cases decided before plaintiff's medical keeplock ended dealt with the precise situation presented here. The prior cases involved inmates who were denied exercise due to alleged or actual disciplinary violations, or for other prison security reasons. Those inmates, unlike plaintiff, had no control over this condition of their confinement once imposed. Under the medical keeplock policy, an inmate could end his confinement at any time by submitting to the PPD test, as plaintiff here eventually did.

In *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.1971), the Second Circuit examined a case in which the inmate held the keys to his cell with respect to out-of-cell exercise. Sostre challenged various conditions of his confinement in punitive segregation, among them the fact that he remained in his cell at all times except for a brief shower once a week. *Id.* at 186. The court noted that Sostre could have had one hour of exercise each day, but that he refused this privilege because he would not submit to the strip search that all prisoners underwent when utilizing the exercise yard. *Id.* Thus, the existence of an "opportunity for exercise" was one of the factors the court cited in denying Sostre's Eighth Amendment claim. *Id.* at 193–94.

In examining plaintiff's Eighth Amendment claim above, the Court rejects defendant's argument that, because plaintiff held the keys to his cell, the medical keeplock policy is constitutional. The *Sostre* court did not examine the denial of exercise in detail, and stressed that it rejected Sostre's claim that his segregated confinement violated the Eighth Amendment because of "the seriousness of the multiple offenses charged against Sostre by [the prison] Warden." *Id.* at 194 n. 28. Such seriousness of offense is not present here, and allowing the plaintiff to exercise would not have posed an undue threat to prison security. In addition, many cases decided after *Sostre* (and discussed above) examined the right to exercise in more detail and established the principle that a total denial of exercise is indeed unconstitutional.

98

However, given the reasoning of *Sostre* and the fact that neither the Supreme Court nor the Second Circuit has examined the precise situation presented by this case, it was not clearly established that the medical keeplock policy violated federal law during the period of plaintiff's confinement.[5] Nor was it unreasonable for defendant to believe that the policy was constitutional. *See Mitchell,* 954 F.2d 187, 191 (4th Cir.1992) (Fourth Circuit has "never held that denial of out-of-cell exercise opportunities is per se unconstitutional cruel and unusual punishment" because "confinement or punishment conditions imposed under one set of circumstances may constitute an Eighth Amendment violation; yet the same conditions, imposed under different circumstances, would not"). Therefore, defendant is entitled to qualified immunity from civil damages.

III. *Conclusion*

The Court finds that it was a violation of plaintiff's Eighth Amendment rights to deny him exercise during the period he was in medical keeplock. However, it was objectively reasonable for the defendant to believe that the challenged policy did not violate plaintiff's rights between March 3, 1993 and October 12, 1994. Accordingly, defendant's cross-motion for summary judgment is granted and this action is hereby dismissed.

**SO ORDERED.**

---

5.  Plaintiff claims that 7 NYCRR § 304.3, which requires one hour of exercise a day for Special Housing Unit (SHU) inmates, clearly establishes the law on denial of exercise. Putting aside the fact that this regulation does not address plaintiff's situation in that he is not a SHU inmate,

"[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984).